The final case of the day is Lapre v. Chicago. Ms. Bacos. Thank you, your honors. May it please the court, my name is Abby Bacos and I am here representing the plaintiff appellant Vertulie Lapre, the administrator of the estate of her late son, Okoye Ophem. We are here today because the city's customs, policies, and practices caused the hanging death of Okoye Ophem while Ophem was in the custody of the Chicago Police Department. This case asks this court to consider one simple question. Whether the district court in its summary judgment ruling ignored numerous disputes of material fact. We believe the answer to that question is yes. Suicides by hanging in the city lockups are not at all unusual. They are a common occurrence. The city noted that 14 suicides or attempted suicides from hanging from bars by the detainee's clothing occurred within the two years preceding Mr. Ophem's death. And several employees testified that they observed one or in some instances numerous suicide or suicide attempts in the lockups. Did the plaintiff depose a Rule 36B witness from the city? And if not, why not? Your Honor, we did not depose a Rule 36B witness. And we did not do that because in part, Your Honor, we did not believe that it was necessary to in light of some of the admissions that were set forth in the email evidence that we believed were sufficient in themselves to establish that the city was aware that this was a continuing issue. It was aware of some of the things that it needed to do to address the issue. And then it took a conscious, it made a conscious decision to simply do nothing. And we know that because the suicides continued in the lockups. Counsel, could you be more specific about the statistics you're using and the sources of them? They seem rather kaleidoscopic to me over the course of the briefing. Sure. And in particular, I'd like you to be very clear about the difference between successful suicides and attempts, which may be much more ambiguous. Sure. I think what we mean by successful suicides are individuals who obviously I know what a successful suicide means, but I have no idea what reliable evidence there is of those numbers. Your Honor, the city, well, especially with regard to the 14 suicide and suicide attempts in the city's brief, that that was the information that they had as well. What time and what geography? And those were, I don't have that exactly in front of me, Your Honor. It is in the brief, and it is in the footnote of the brief, the dates, and the manner in which each of those suicides occurred. And I can take a look at that. I think that it's important, and I will go back to looking at that so I can provide the correct information, but I think that it's important that even, as the court has noted in other cases, even evidence of two suicides or attempted suicides may be enough to establish deliberate indifference, so long that it is enough that it puts the city on notice. Look, everybody knows that there's a risk of suicide in custody, okay? Let me just tell you my biggest concern with your case and ask you to address it. There are a lot of different practices that can reduce the risk of suicide. It may have to do with screening on intake. It may have to do with cell design. There are steps that can be taken with respect to emergency response training and policies and practices that can be put in place with respect to monitoring people, particularly those at the greatest risk. Is it your contention that a city must adopt all available means to reduce the risk of suicide or be deemed deliberately indifferent? No. Okay. It seems to me that from the Frank case that we recognize you need to treat all of these things together. So, you know, you're focusing on horizontal bars, understandably, given the facts of this case, but was it deliberately indifferent for the city to not rebuild cells in older lock-up facilities? I believe the answer to that is yes, and the reason is because the suicide and suicide attempts by hanging from clothing were continuing, especially in the older lock-ups. And because they were continuing, and because the city continued to adhere to an approach by leaving the older lock-ups with the horizontal bars, that they knew or should have known that it was not feasible to keep the bars the way they were because suicide wasn't seen. What is the evidence that horizontal bars increase the number of suicides? Well, the evidence is simply all of the incidents that we list. No, that's not a means of drawing an inference. You want to compare the number of suicides in cells with horizontal bars against the number of suicides in cells without horizontal bars, where the inmates controlling for other inmate attributes. All that happens when you show that horizontal bars are used in, say, 10% of suicides,  it doesn't show that people actually commit suicide more often. People are quite inventive. If they want to commit suicide, there are many ways to do it. That's why you need to have data about cells with these bars and cells without them. Are there any such data? Not that I'm aware of, Your Honor. Isn't that a problem for a plaintiff? I can understand. Ties pay the defendant. Sure. I mean, I can understand why that would be a problem. I think that in any event, I think that the city is, and I think that this is also an important point, if the city is going to leave these horizontal bars, then they need to take at least some additional measures to adequately train their employees who are on the front lines of protecting these arrestees. No, you're now assuming what is to be proven, that the horizontal bars increase the suicide rate. And my question to you is, what data supports that? You concede you have none. That is correct. And if there is no such effect, presumably you don't have to take any efforts to offset it. Right? That's why I wanted to explore whether there was any reason to do this. You know, I have the same question about your contention, that the full set of intake questions should be asked on returning from court. Well, we know that intake, immediately after somebody goes into custody, is the highest period of suicide risk. That's based on very sound data. Are there sound data which suggests that there's another period of high suicide risk on returning from court? Not that I'm aware of. Well, but you see, I hope you see my problem. You're saying that the city had to treat intake and return from court the same way. We know there's a high risk on intake, but we don't know that there's a high risk on return from court. So why should they have to treat it the same way? What in the Constitution requires them to treat it the same way, if there's no elevated risk? I don't believe that there's anything in the Constitution that says that they have to treat it the same way. I think that the Illinois jail and lock-up standards related to that particular issue. There is a huge literature about suicides in prison, empirical literature, about what kinds of cells and what kinds of conditions and when, largely right after intake and so on. It may be that the answers to my question can be found in that literature. Sure. But the plaintiff has the burden of persuasion in a civil case. I understand that. If there are no other words, what evidence is there that the city, as a matter of policy and practice, failed to take other reasonable measures to diminish the risk? There is evidence that the city contemplated a more thorough intake process to be able to identify individuals who may be suicidal. And we know that the city did not, in fact, impose the additional questions. That is just one example of that. We know that the city discussed installing suicide kits to address some of these issues. The city was aware of, and the city just simply chose not to install the suicide kits. We also know that the city did not train any of its personnel on immediate first aid to suicide-hanging victims, although it knew that the personnel would come in contact with these victims on a regular basis. And the city just made another conscious decision not to provide those kits. And whether or not providing all of those things would have prevented Mr. Opham's death, we believe is a jury question. If there are no further questions, we would ask that this court reverse the district court's decision and remand this case for trial. Thank you. Thank you, counsel. Ms. Masters. May it please the court. Ms. LePray has not developed a record sufficient to show a genuine issue of material fact to survive summary judgment on her Lindell claim. Her claim required her... Do you know anything about this, the empirical literature on suicide risk in prisons? Your Honor, I do not. It's very disappointing. This is fundamentally an empirical claim. There are certain things that jails do that increase suicide risk and certain things that decrease them. And political scientists and sociologists have been studying this for 50 years or more. And to have a debate about what kinds of things the city is doing without either side having consulted the available data is really very disappointing. Your Honor, it's our position, and I understand your disappointment from the court's perspective, it's our position as the litigant and the defendant in this case. I understand. The defendant has the benefit of the burden of proof. But there's always this tendency in litigation just to deny whatever the other side says and not to do any independent work. And here the city has denied whatever the plaintiff said but hasn't done any independent work. We've denied it because there was no reason for us to do independent work is our position. And because the plaintiff did not produce... Well, one reason to do independent work might be to reduce the number of suicides. Oh, Your Honor. A case like this might prompt the city to find out what increases risk in fact and to mitigate that risk. Oh, absolutely, Your Honor. But I'm just saying as a matter of record, let me be 100% clear that Ms. LePray has suffered an inestimable loss. We don't dispute that. Our position is just as a matter of summary judgment to the process of responding to summary judgment that we don't have a burden to produce all kinds of evidence. That much I understand. But you still might want to figure out what would help the citizens of Chicago who get imprisoned. Absolutely. We agree with that. I think the record reflects that we have undertaken steps. It's in the e-mails that counsel referred to. We could look at the Frake case and we could see that there are changes since Frake. One of the complaints of Frake was that we put suicidal detainees in cells by themselves. That policy has changed. If we suspect someone is suicidal, we put them in a cell closest to the entrance to the lockup with another detainee. Frake refers to two inspections by watch commanders per tour. That has doubled. It's four. We have started lockup keeper first aid training in 2011. And we also build new facilities without horizontal bars. It's our position that the record does not reflect any affirmative evidence from the plaintiff that we are deliberately indifferent. We do make changes. The e-mails that are attached to the brief indicate that we study this issue. We try and do our best to adopt policies to prevent suicides. We're not perfect. We could be, but we are not, and that's actually not the constitutional requirement. With good reason. Ms. Masters, do I correctly understand here that Mr. Opham was the only inmate in custody? He was, Your Honor. When he managed to commit suicide and nobody saw him until it was too late? Essentially, yes. I've got to say, that's just mystifying to me. It's tragic. It is that as well. We would agree with you on that. He was, you know, someone saw him hanging and went to try and save him and resuscitate him. And were ultimately unsuccessful. What I was amazed at is the way, you know, he tried to save him was with pen knives. I mean, you know, if this occurred, one would think that, you know, there would be some sort of instruments that could be used rather than pen knives. I wanted to ask you why you think that Siddy's emails are inadmissible hearsay. Is there some reason not to treat them as admissions of a party opponent? And I wondered if you're challenging the authenticity of documents that you yourself produced. Your Honor, our point of the admissibility is that some of those email responses don't indicate that the person who wrote them is actually a city employee. Do we think that ultimately they could be verified in the foundation established? Yes, we do. We also think those emails are extraordinarily helpful to us and not harmful because, in fact, they begin, they show a process to consider policies on how to reduce and eliminate the policies. I mean, sorry, the problems of attempted suicides and lockups. So in the appellant's brief, page 45 of their appendix, at the very bottom, the initial email that starts this change states, the superintendent is looking for an updated procedure that helps prevent some of the suicide attempts that we have recently experienced and, and, and is in all capitals, wants to see it tomorrow. I mean, this is a real sense of urgency. And on page 39, there's someone who is, I believe it's page 39. There's another email, and I can't find the page at the moment. Oh, here it is. It's page 49. There's a response email in the middle of the page that ends. A work in progress, and because it is such a critical topic, it will require additional discussion, review, staffing before publication. This is in terms of revising our policy, which is the one that was in effect at the time Mr. Well, there, there seems to be plenty of evidence that the city developed training. Besides, what evidence is there about the city actually giving the training? With what frequency is the training given? Is it given to everyone who monitors the lockup? Here we have someone who had no idea of how to deal with this. Is there any evidence in the record at all on giving the training, as opposed to the existence of training materials? Yes. And a sense of urgency. What about doing it? Yes, Your Honor, there is. In fact, Mr. Carrillo's training records, Officer Carrillo's training records show that he had training specifically on suicide prevention. And he doesn't, he says he doesn't remember it, but there is evidence we gave it. And again, it would be the, ultimately, as well on that particular issue, the plaintiff would have had to develop a record on causation. And there isn't. She points only to her own son's regrettable death. But that is not evidence that we don't train and that, in fact, a lack of training as a policy matter causes injury and death. This court is obviously aware of the issue on the statistics. They made up a rate. They conflate attempted suicides and actual suicides. For the reasons we set forth in our brief and the reasons we stayed here today, if the court has no further questions. What is a reliable measure at the relevant time of the incidence of successful suicides in city custody? Your Honor, could I ask you to rephrase your question? Okay. Reliable information about how many suicides are happening in city custody. Where do we find that? I think a 30 v. 6 witness, Your Honor. It's not in this record? It is not in this record. Oh, I'm sorry. In this record? There isn't evidence in this record that separates. Well, let me backtrack. There's various sources. There's an exhibit that the plaintiff cited in their summary judgment motion that we discussed as well that outlines, I think, in an 18-month time period, attempts and actual suicides and does show one suicide in 2011. As opposed to everything else, just more generally, you would need a 30 v. 6 witness to come in and start talking about statistics. I would think, and also an expert from their part, on their end, to talk about, in terms of bond share, what's the rate in custody, what's the rate out of custody because the relevant comparison is to the out-of-custody rate as well as to in custody and other lockups. Does that answer your question? I guess as far as this record goes, yes. Thanks. We ask that the matter be affirmed. Thank you very much. The case is taken under advisement and the court will be in recess.